[No. 30195. Department Two. June 24, 1947.]

KENNETH N. ALLEN, *Appellant*, v. MARGIE E. ALLEN, *Respondent*.[1]

¹Reported in 182 P. (2d) 23.

*Cameron Sherwood* and *Albert N. Bradford*, for appellant.

*Casey & Johnson*, for respondent.

HILL, J.—The interlocutory decree entered in this case on December 21, 1943, awarded the custody of the son of the parties, then nineteen months of age, to the respondent, but awarded to her foster mother, Edith L. Ridenour, the general supervision of the child while it was in respondent's custody.

The giving of general supervision to Mrs. Ridenour proved to be very wise, for, within less than three weeks, respondent left her child to follow the pursuit of her own inclinations and did not return to her foster mother's home in Walla Walla until some nine months later, in October, 1944. ( Incidentally, as soon as respondent left Walla Walla, Mrs. Ridenour voluntarily surrendered the child to the appellant, and it was cared for in his parents' home until he went into the army, in March, 1944, at which time the child was returned to Mrs. Ridenour. Apparently, he had also had the care of the child from the time of the separation of the parties in February, 1943, until the entry of the interlocutory decree in December, 1943.)

From respondent's own letters, it is apparent that her infatuation for a brother of the appellant, plus a love of pleasure, excitement, and gaiety which appellant apparently deemed incompatible with his position as a minister, were the principal causes of the disruption of the home. The trial court, at the time of the divorce proceeding, attempted to make clear to respondent that society would not condone her continued relationship with her husband's brother or any marriage to him.

Letters written by her to the brother in February, 1944, from McCook, Nebraska, displayed a complete disregard of the admonitions of the trial court and the continuance of the infatuation. She expressed her philosophy of life in these words: "What you want out of life, you have to go out and get and that is what I intend to do one way or

the other." Again, discussing a choice between her lover and her baby, she said, "I decided I could have lots of babies but there is only one you."

Jilted by her lover, she went from McCook to Kansas City, Kansas, and thence, in late July, to Casper, Wyoming, to marry one Truman Wood, a soldier she had met at McCook. The marriage did not take place until September 13, 1944. Within three weeks after the marriage, Mr. Wood was sent overseas, and, early in October, she returned to Walla Walla to live with her foster mother. This was the first time she had seen her baby since January 9, 1944.

She received an allotment from Mr. Wood, but, in November, 1944, she began going steadily with Harold D. Dryer, then a married man, who was a member of the armed forces stationed near Walla Walla. Both Mr. Dryer and respondent denied any misconduct during the period of their association in Walla Walla.

When it became known that her husband, Mr. Wood, was returning from the service, she went to Coeur d'Alene, Idaho, leaving Walla Walla on November 15, 1945, and returning the latter part of January, 1946. During this period, her maternal instincts and her love for her child were satisfied by a single week-end visit when Mrs. Ridenour took the child to Spokane to meet her there.

Asked on direct examination as to the purpose of her visit to Coeur d'Alene, respondent replied:

"I was ill and my husband and I were having trouble. My friend wanted me to come up. I was alone all day and I could just rest. She wanted me to come up and see if I wouldn't feel better."

(Any trouble she was having with her husband must have been by correspondence, as he had not returned to Walla Walla at the time she left for Coeur d'Alene.)

It later developed that she secured a divorce from Mr. Wood at Coeur d'Alene in January, 1946. After this almost patently fraudulent divorce, she returned to Walla Walla for about two months. She then went to Pocatello, Idaho, leaving on March 31, 1946, and there lived with Mr. Dryer for three and one-half months before their marriage on

August 3, 1946, he being under the disability of a pre-existing marriage until sometime in May.

She did not return to Walla Walla from March 31, 1946, until she came back in September of that year to sign certain papers in the proceeding which appellant had started to secure custody of the child, at which time she, too, made application for his custody.

If we assume the validity of her Idaho divorce, when this matter came on for hearing on November 8, 1946, her illicit relations with Mr. Dryer had terminated only three months previously, with her marriage to him.

We turn now to the record of the appellant. As previously indicated, the child was in his care from the time the parties separated in February, 1943, the child then being some nine months old, until March, 1944, when he went into the army, except for about three weeks immediately following the entry of the interlocutory decree, during which time the child was with the respondent at her foster mother's home. Each of his three furloughs he spent with the child in Walla Walla, and, immediately after his discharge, he commenced proceedings to modify the interlocutory decree so that he might have the child with him.

During the periods that appellant had the child, the youngster was taken care of in his parents' home. His mother frequently boarded and cared for small children, and, at the time of the trial, a man with two small children was living in the home. There was testimony that appellant was building a home of his own and that he expected to marry in the spring, and that his fiancee was or would be a graduate nurse.

No one suggests that appellant is not a proper person to have the custody of this child. In fact, when asked the question, "Mrs. Dryer, do you know any reason why Mr. Allen would not be considered a fit and proper person to raise the boy?" respondent replied, "Only the fact he hasn't a wife and hasn't a home of his own."

The only testimony suggesting that the home of appellant's parents was not a proper place for the child was that of Mrs. Ridenour, who testified:

"Q. Now, have you noticed whether or not the child has had any upsets when he visited with the Allens or was taken by the father? A. There were a few times this summer when he did come home he would have a nervous digestion upset. I wouldn't say that they hadn't taken good care of him, it was change of food and children around. I would say a nervous excitement. Q. You have noticed that Mrs. Allen has quite a number of children there? A. She has some at the present time. Q. Do you think it is wholesome to be raised with other children like that as it is for the child to be raised in a home by itself as to contagious diseases? A. My idea would be that too much of that would not be good. When he did come home, not each time, but several times, he did. I told Mr. and Mrs. Allen about it. He would be nervous and upset and off his food for a few days, but they know about that. That was early in the summer. Q. He was disturbed in his routine? A. He is active. The children were active and the hard play had something to do with that."

It is to be understood that no one criticizes Mrs. Ridenour's care of this child. It is agreed that she has taken and will continue to take excellent care of the child if he is left with her.

We have three much-quoted rules with reference to custody cases: (1) The welfare of the child is a paramount consideration in ascertaining its custody; (2) children of tender years will not be taken from their mothers unless it is clearly shown that the mother is an unfit and improper person; and (3) it is not the policy of the law to take children away from their parents and give them to strangers, merely because the strangers are better provided financially to rear and educate them than are the parents.

The second and third of these rules in no way conflict with the first. They are but expressions of what, under ordinary circumstances, is for the welfare of the child, and are intended to indicate that the determination of that welfare is not a weighing of the material advantages offered by contesting parents or third persons.

The trial court was confronted with a particularly difficult situation. The physical possession of the child obviously could not be given to the mother at the time

of the hearing, and her petition for custody was properly dismissed. As was said in the memorandum decision, "She may, for all I know, in a few months have a fourth husband."

The child was being adequately and competently cared for in the home of Mr. and Mrs. Ridenour, foster parents of the respondent. Their home was, perhaps, better in some respects than the home of Mr. and Mrs. Allen, parents of the appellant.

The father, while a proper person to have the child, was contemplating matrimony with a young lady trained, or in training, for a nursing career, who might or might not care to take the responsibility of this child. The trial court was not given the opportunity to see her or to hear her testify or in any way to evaluate her qualifications for taking care of the child.

The trial court was in this dilemma: If the father presently moved into a new home with a new wife, taking the child with him, the court was called on to guess what kind of a home that would be. It was no abuse of discretion to refuse to speculate on that point. If the father moved into a new home but if, for any reason, his wife did not want the child or felt that she must follow the profession for which she was trained, to augment the family income, the child would be left with appellant's parents, and the court would be, in effect, choosing between the home of the foster parents of the respondent, where the child had received excellent care, and the home of the parents of the appellant.

Faced with this situation, there certainly was no abuse of discretion in leaving the child where it was. We believe that the very able and understanding trial judge, who had also heard the divorce proceedings, was correct, under the particular circumstances then existing, in leaving the child with Mrs. Ridenour.

■ This was the matter of primary importance before the court, but appellant's application for modification of the interlocutory decree should not have been dismissed; instead, the hearing thereon should have been continued for

a period of six months, to determine whether or not appellant was going to have a home of his own which the court might feel was a proper place for the child.

Apart from the question as to where the child should be, which we hold was properly decided, there were other questions involved which the trial court should have determined and which it probably would have considered had attention been directed to them. We are convinced that the following modifications should be made in the interlocutory decree:

1. The legal custody of the child should be taken from the mother. By her conduct since the interlocutory decree, she has clearly demonstrated that she has preferred three different men to the opportunity and the privilege, which the interlocutory decree afforded her, of taking care of her child. She has actually been with the child less than sixteen months out of the almost three years between the entry of the interlocutory decree and the hearing on the petition for modification. Her own conduct and her indifference, as evidenced by her long absences from the child, do not permit the invocation of the second rule above referred to.

The trial court expressed the thought, in its memorandum opinion, that a little further time would determine whether or not the respondent had settled down and would be a good wife and mother. It is entirely possible that she may do so; but such a reformation should be evidenced, not by a few months of conduct free from criticism, but by substantial evidence of such character as befits one having the physical, moral, and spiritual care of a growing child. If there is to be a subsequent modification, the burden should be on her to establish her fitness.

2. The legal custody of the child should be awarded to the father, who, by his conduct, has demonstrated his concern and love for the boy.

The child should continue to live with and be cared for by Ethel L. Ridenour until such time as the trial court is convinced that appellant has a proper home for the child

wherein he is himself residing. The third rule above referred to is applicable to the instant case.

We do not know whether appellant has carried out his plan and is married and now has a home of his own where the child can be cared for. If he is not married and is living with his parents, although the Ridenour home may be more comfortable and less crowded than the Allen home, we are not convinced by the testimony of Mrs. Ridenour, heretofore quoted in this opinion, that such a situation exists as should prevent the father's having the child with him in his parents' home, having in mind what this court said in *Curtis v. Curtis,* 46 Wash. 664, 91 Pac. 188:

"While the welfare of the child is, in all cases where the court is clothed with power of its disposition, the primary consideration, yet it is not the policy of the law to take children away from their parents and give them to strangers merely because the strangers are better provided financially to rear and educate them than are the parents. Parents are their children's natural protectors. They have an interest in them that is not shaken by acts of disobedience or ingratitude, and because of this interest children under their parents' immediate care, even though their surroundings be humble and their opportunities narrow, are much more apt to grow up useful men and women than they are when reared by strangers who do not have this natural affection for them. When, therefore, the parents are able to care for their children, it is the policy of the law to award their custody to them rather than to the custody of strangers."

The cause is remanded to the trial court, with instructions to make the modifications relative to legal custody herein suggested, and to take further testimony on the question of whether the appellant now has a home into which the child may, with propriety, be taken.

We are quite sure that the trial court will, in the light of the testimony to be taken, make such orders with reference to the actual physical custody of the child as will be in its best interests.

MALLERY, C. J., STEINERT, ROBINSON, and JEFFERS, JJ., concur.