[No. 31721.   Department Two.   August 9, 1951.]

MYRTLE M. MERKEL, *Respondent,* v. HAROLD B. MERKEL, *Appellant.*[1]

[1]Reported in 234 P. (2d) 857.

*Paine, Lowe & Coffin* and *Fred E. Woeppel,* for appellant.

*Cannon, McKevitt & Fraser,* for respondent.

HAMLEY, J.—This divorce action was heard on the wife's complaint alleging cruel treatment and personal indignities rendering life burdensome, and the husband's cross-complaint alleging cruel treatment and adultery on the part of the wife. After a lengthy trial, the court entered findings of fact, conclusions of law, and a decree, granting both parties a divorce on the ground of cruel treatment. The decree also provides for the custody of the three children, divides the community and separate property, and awards alimony and support money to the wife and children. The husband has appealed.

Appellant contends that the trial court erred in finding that appellant had treated respondent in a cruel manner; in concluding therefrom that respondent was entitled to a divorce; and in granting respondent a divorce on the basis of such finding and conclusion.

Appellant himself sought and obtained a divorce in this proceeding. There has been no cross-appeal. The parties will therefore remain divorced whether or not respondent should have been granted a divorce. Under these circumstances, and in conformity with the long-standing rule in this jurisdiction, we will not consider the assignments of error directed to the conclusion of law and decretal provision awarding a divorce to respondent. *Schirmer v. Schirmer,* 84 Wash. 1, 145 Pac. 981; *Regenvetter v. Regenvetter,*

124 Wash. 173, 213 Pac. 917; *Kirsch v. Kirsch,* 192 Wash. 156, 73 P. (2d) 356; *Cornwall v. Cornwall,* 13 Wn. (2d) 594, 126 P. (2d) 52; *Hathaway v. Hathaway,* 23 Wn. (2d) 237, 160 P. (2d) 632.

The correctness of the findings of fact relative to appellant's cruel treatment of respondent will be considered below in connection with the question of the custody of the children.

Appellant assigns as error the trial court's finding of fact that adultery was not proven against respondent. This finding of fact bears only upon the custody question, and will be considered in that connection. This is true because appellant was awarded a divorce on the ground of cruel treatment and is not aggrieved because the trial court did not specify the additional ground of adultery.

The next group of assignments relates specifically to the question of the custody of the children. There are three children: Dolores, who was eighteen years old when the decree was entered on June 23, 1950; Gordon, who was then sixteen years old; and Kenneth, who was then fourteen years old. The trial court awarded the custody of Dolores and Kenneth to respondent, and awarded the custody of Gordon to appellant, providing in each case for reasonable opportunities for visitation.

Appellant assigns error upon the trial court's finding of fact that respondent is a fit and proper person to have custody of Dolores and Kenneth; upon the entry of the provisions of the conclusions of law and decree awarding their custody to respondent; upon failure of the court to find that appellant is a fit and proper person to have custody of all three children; and upon the failure of the court to provide in the conclusions of law and decree that appellant should have the custody of all three children.

Harold B. Merkel and Myrtle M. Merkel were forty-three and forty-one years old, respectively, at the time of the trial in January, 1950. They were married on November 15, 1928, and lived on a wheat farm at Edwall, in Lincoln county, until August, 1945. They then separated, Mrs. Merkel and the children moving to a house the family had ac-

quired in Spokane. Mr. Merkel continued on the farm. The children frequently visited Mr. Merkel on the farm until the last year or two, and the older son, Gordon, has been living there with his father since 1947. Mrs. Merkel also came back to the farm for periods of several weeks at a time in 1946, 1947, and 1948, to help out during harvest time. However, there was no resumption of the marital relation, and the parties have not been on friendly terms since 1948.

The trial court found that Mr. Merkel was the fit and proper person to have the custody of Gordon. There was no specific finding that he was not a fit and proper person to have the custody of the other children. Bearing upon this point, however, was the finding that Mr. Merkel had treated his wife in a cruel manner to such an extent that, in the month of May, 1945, the marital relationship between the parties had been terminated.

The findings recite that such cruel treatment consisted of excessive use of intoxicating liquors combined with the excessive use of pain-killing medicines almost to the point of addiction. It is further recited that, as a result, he became irritable and violent of temper, and once threatened to commit suicide, thereby inferentially threatening the security and well-being of his family. The findings refer to three separate occasions on which his excessive use of intoxicating liquor caused embarrassment, humiliation, and mental suffering to the family. Reference was also made to his arrest, in 1946, for driving while under the influence of liquor. On the basis of these findings, the trial court concluded that Mrs. Merkel was entitled to a decree of divorce.

Our examination of the record confirms these findings of the trial court. There are, however, some mitigating circumstances which ought to be taken into consideration in determining whether these facts establish that appellant is now unfit to have the custody of all three children, assuming this would be otherwise desirable.

About 1930, Mr. Merkel began experiencing pains in his back. These grew progressively worse, and by 1939 had become almost unbearable. He found it almost impossible to get any rest at night, and was unable, at periodic inter-

vals, to carry on his farming activities. He sought treatment from a succession of doctors, and was several times hospitalized. All of these factors adversely affected his temperament and disposition. In an effort to find relief from his suffering, Mr. Merkel began using intoxicating liquor to excess, and, as would be expected, this only added to his troubles. The medicines which he began taking in the late 1930's contained opiates or narcotics, a fact which he did not know until 1943 or 1944.

It is evident that the family friction which developed, and the misconduct referred to in the findings, stemmed from this combination of narcotics, liquor, pain, weakened physical condition, and worry, all resulting from the physical disability from which appellant was suffering. In the fall of 1947, appellant submitted to an operation, during which it was found that an intervertibral disc was impinging upon the nerves of the lower spine. The disc was removed and a spinal fusion was effected.

His doctor estimates that, as a result of this operation, Mr. Merkel's physical condition has returned to eighty or ninety per cent of normal. His weight, which had dropped to one hundred forty-five pounds prior to the operation, is back to a near normal one hundred ninety-two pounds. He is able to, and does, do heavy farm work, including plowing. He has ceased all use of intoxicating liquor, except for an infrequent glass of beer. He now uses no medicines, except one prescribed medicine containing no narcotics. A housekeeper now runs the home at Edwall for Mr. Merkel and his son. The father and son attend church regularly, and there is every indication that they are living in peace and harmony.

In view of all of these circumstances, we do not believe that the trial court withheld the custody of Dolores and Kenneth from their father because he was deemed unfit. Rather, the indications are that the custody of Dolores and Kenneth was given to the mother because they had lived with her in Spokane since 1945; they apparently preferred living with her; the possible feeling that the mother could be of more benefit to Dolores and Kenneth than could the

father, under the circumstances; and the finding that she was a fit and proper person to have their custody. It is this last finding which appellant most vigorously challenges.

The trial court specifically found that Mrs. Merkel was a fit and proper person to have the custody of Dolores and Kenneth. Also relevant to the question of Mrs. Merkel's fitness to have the custody of these children are these findings of fact:

"The Court finds as a fact that after the parties had separated the plaintiff and cross-defendant herein did associate with men other than the defendant herein during the married life of the parties hereto. The Court further finds that such associations on the part of the plaintiff with men other than her husband constituted cruel treatment to such an extent that it has rendered reconciliation impossible and likewise entitles the defendant and cross complainant to an absolute decree of divorce between the parties hereto.

"With regard to the allegations contained in defendant and cross-complainant's answer and cross-complaint, together with the bill of particulars supplementing said cross-complaint referring to the various acts of adultery allegedly having been committed by the plaintiff and cross-defendant herein, the Court finds as a fact that the allegations are solely and utterly without foundation in fact and that the defendant and cross-complainant has utterly failed to prove the same and that such adultery has neither been proven nor established."

Our examination of the record convinces us that these findings are exceedingly charitable to the wife. The testimony of two farm hands and Mrs. Merkel's own letters, eleven of which were placed in evidence, show that she carried on an affair with one man from the spring of 1945 (prior to the separation) until sometime in 1947. Her own counsel refers to this as an "affair *de amour*." The testimony was that on numerous occasions in the spring and summer of 1945, when Mr. Merkel was in Spokane and Mrs. Merkel was at Edwall with the children, this man would come to the house at night and leave at four or five o'clock in the morning. Mrs. Merkel denied this testimony, and denied she had ever committed adultery with this man.

Her letters to him, covering the period from July 22 to October 2, 1946, begin and end in terms of utmost endearment. A lipsticked imprint of her lips decorates one of these letters, and a similar imprint adorns a slip of paper enclosed with another letter, along with the words "All for you darling, Always." The content of these letters indicates that these two people were deeply in love with each other in 1945; that there was then a cooling-off period; and that, late in 1946, the affair again blossomed out. The letters also abound with sarcastic remarks regarding Mr. Merkel.

It is not necessary to encumber this opinion with lengthy quotations from these letters. However, a few excerpts are set out below to indicate the nature of this affair:

"But don't ever turn on another that loved you as I did, its too hard to take after a yr. of happiness, you just aren't the same person any more—"

". . . would like to hear from you, if you care to write —don't know where I'll be; at what time so be careful what you put in it."

"How did you make it? I worried. I landed in bed few min. after 3—so far not a word has been said, in fact they came in 20 to 6 this a.m. I was ready thou, guess he wanted to show me he could & I couldn't . . ."

"Honey I haven't a bit of news still love you in spite of everything. If you decide to come let me know—Glad of. last nite, hope you feel better."

"Honey I'll write tomorrow. I'm not putting my return on these any more in case you don't get them (maybe I wouldn't) Bye darling, I miss you—All my Love."

"Since so many things could happen guess I'll stay home & think of you—wont be long now & you'll be home—maybe some wk. end we can scram to Portland."

"You'd better be sure & keep these out of Dan's reach—please—yours are in a safe place, in case anything happens to me look under my mattress. We'll burn them together some nite. I'll never keep anything that could really do any damage—so don't be afraid. I get them myself all but one Dol. got in & she was mad I wouldn't let her read it. Wonder why??"

In 1947, there was a falling-out between Mrs. Merkel and this man, who is now married. He apparently followed her or lingered around her Spokane home on several occasions

that year, and was twice arrested for creating a disturbance at her home while under the influence of liquor. He took the stand during the divorce trial, and testified regarding four occasions, involving three different men, whom he identified, when he saw Mrs. Merkel in a compromising position at various places in Spokane. The trial judge, however, concluded that his testimony was the "figment of a drunken and jealous imagination" and the witness' way of "getting back" at Mrs. Merkel. The trial court therefore wholly disregarded his testimony, and we are inclined to do likewise.

Appellant's counsel employed a private detective to observe Mrs. Merkel's nighttime activities between May 4 and October 10, 1949. This was several months after the divorce action had been instituted. This witness observed Mrs. Merkel frequently in the company of a man who then operated a grocery store in an outlying section of the city. The witness testified that on two specified occasions, Mrs. Merkel and this man went in the store late at night, and from there into adjoining living quarters, where they remained for the night with all lights out.

Mrs. Merkel testified that on these occasions, one or both of the storekeeper's parents were present, and that she stayed at night so that she could open the grocery store the next morning while the storekeeper went fishing. Her home was about twenty or twenty-five minutes driving distance from the store. On these occasions, according to Mrs. Merkel, the children were left with neighbors or relatives. The detective had testified that he had seen no other persons around the store premises, and that both Mrs. Merkel and her companion were in the store the next morning. Mrs. Merkel acknowledged that this same man had boarded at her home for periods in 1948, occupying a basement apartment; that she had driven him to work on occasion; and had permitted him to use her car. She denied committing adultery with this man or any other of the men named by the various witnesses.

There is much discussion in the briefs as to the factors which must be present in order to establish adultery by circumstantial evidence, and whether those factors were pres-

ent in this case. However, we are not here concerned with whether adultery was proved as a statutory ground of divorce. Our problem is whether respondent is a fit and proper person to have the custody of the two children. Whether or not the evidence established adultery, it is abundantly clear that respondent conducted herself in a grossly improper manner with several different men over a period of four years.

The record discloses other factors bearing upon respondent's qualifications to care for these children. In her favor is the uncontradicted testimony that she was a good housekeeper and cook, kept the children clean, and brought them up in such a way that they were well-behaved. On the other side of the ledger is the testimony, generally admitted, that she spent many of her evenings frequenting night clubs in and around Spokane in the company of male companions. It would also appear that she is preoccupied with horse racing, and consistently spends much time at the track during the racing season. Her letters which are in evidence make reference to her winnings or losses at the track. She frequently took the children to the races. On one occasion, according to appellant, when he wanted the children to go to church instead of the races, she said: "To hell with church." There is also reason to believe that Mrs. Merkel has, in the last year or two, exerted her influence to prejudice Dolores and Kenneth against their father.

■ Viewing the record in its entirety, it is our considered opinion that the trial court's finding that respondent is a fit and proper person to have the custody of Dolores and Kenneth is against the clear preponderance of the evidence. Proof that a child's physical needs are being met is not enough. They must be brought up in a wholesome, moral atmosphere, if they are to become good, upright, law-abiding citizens. See *Warnecke v. Warnecke,* 28 Wn. (2d) 259, 182 P. (2d) 699. Respondent has not been providing such an atmosphere for Dolores and Kenneth, and they should accordingly be removed from her custody.

However, we cannot say, on the basis of the record before us, that the custody of these children must be awarded to

the father. While we find that he is a fit and proper person to have their custody, there is the question of whether he can work out the proper living arrangements. At the time of the trial, he was somewhat uncertain as to what his plan would be. There is also the question of whether there is such feeling between these two children and their father that it would be impracticable for him to have their custody.

Additional considerations include the special provisions which may be necessary because of Kenneth's defective eyesight, and whether Dolores, who is now nearly twenty years old, is engaged in some worthwhile undertaking which would be interrupted by a move to Edwall. Dolores and her maternal grandmother are on very friendly terms, and there is some intimation in the record that the grandmother would be willing to accept custody of the girl. It may well be that the best interests of these children will be served if one or both of them are taken from the custody of both parents. See *Allen v. Allen*, 28 Wn. (2d) 219, 182 P. (2d) 23; *Braun v. Braun*, 31 Wn. (2d) 468, 197 P. (2d) 442. This is a problem with which the trial court can best deal upon the remand of this proceeding.

Appellant's remaining assignments of error deal with the findings of fact, conclusions of law, and provisions of the decree, pertaining to the disposition of community and separate property and the allowance of alimony and support money.

The property before the court, without distinction as to its community or separate status, consists of: Two quarter-sections of wheat land at Edwall, on which are located the family home and other farm buildings, of the approximate value of $40,000, but subject to mortgages in the sum of $5,500; a $4,000 equity in a house and lot in Spokane; an undivided one-sixth interest in eight hundred acres of wheat land (subject to a life estate in respondent's mother, who was sixty-eight years of age at the time of the trial) which appellant, on the basis of the American Experience Table of Mortality, estimates to be of the approximate value of $15,000; an undivided one-sixth interest in three lots at

Sprague, Washington, subject to a life estate in respondent's mother, the record containing no estimate of the value of this remainder interest; farm machinery and equipment valued at $10,470; trucks and automobiles of the value of $3,775; household furniture of the value of $3,820; insurance policies having a cash surrender value of $1,710; and farm animals and poultry, valued at $350. The total value of these assets, exclusive of the three lots at Sprague, is approximately $73,625.

The trial court awarded to Mrs. Merkel the following items of this property: An undivided half-interest in the two quarter-sections of wheat land at Edwall, subject to appellant's right to farm the land and retain the proceeds until all of the children of the parties, or the survivors of them, shall attain the age of twenty-one years, at which time the land is to be sold and the proceeds divided equally; $2,500 of the equity in the Spokane house, it being provided that if, upon the sale of the house, the equity value does not amount to $2,500, appellant is to pay respondent the difference; all right, title, and interest in the one-sixth undivided remainder interest in the eight hundred acres of wheat land; a 1947 Oldsmobile automobile, in which the parties' equity interest appears to be about $425; and the household furniture at the Spokane house, valued at $3,500. The total value of the assets thus set over to the wife, exclusive of her interest in the three lots at Sprague (which were not disposed of in the decree, but which were doubtless intended to go to the wife) is therefore approximately $38,675.

Appellant was awarded the balance of the property, having a value of approximately $34,950. He was, however, directed to assume and pay the outstanding community indebtedness, which, exclusive of the $5,500 mortgage balances on the Edwall property, aggregates about $23,500. Thus the net value of the estate awarded to the husband is about $11,450.

Appellant was directed to pay ninety dollars a month alimony to respondent, and one hundred sixty dollars a month for the support of Dolores and Kenneth, this latter

sum to be reduced by seventy-five dollars a month when Dolores attains the age of twenty-one years. Appellant must, of course, pay for the support of Gordon. He was also directed to keep in force policies of insurance in favor of Dolores and Kenneth, in the sum of $2,500 each, no like provision being made for Gordon. Appellant is required, under the decree, to pay respondent $583.49 for attorneys fees and costs in this action, and has his own attorneys fees and costs to pay.

Appellant's Federal income tax returns indicate that in 1948 he had a net income of $6,972.56. It is stated in appellant's brief, and not challenged by respondent, that appellant's annual income, based on present conditions, will average $8,332. This represents the income not only from the three-hundred-sixty-acre home property at Edwall, but from two three-hundred-sixty-acre tracts which he is farming under oral leases on a crop-share basis. One of these tracts is leased from Mrs. Merkel's mother and, under the circumstances, may very possibly be denied to appellant in the future.

The trial court's oral opinion and findings of fact indicate that the one-sixth undivided remainder in the eight hundred acres of wheat land was set over to respondent because such was her sole and separate property, having been acquired by inheritance. The oral opinion and findings also indicate that the Edwall farm property was divided between the parties on the theory that it was, for all practical purposes, community property. Appellant does not challenge the award to respondent of the interest in the eight hundred acres, acknowledging that this is her separate property. Appellant contends, however, that on the same reasoning the Edwall property should have been awarded to him, arguing that it is his separate property, though perhaps subject to a forty-five-hundred-dollar community lien.

The facts bear out appellant's contention respecting the status of the Edwall property.

One of the two quarter-sections comprising this tract was purchased by appellant a year prior to his marriage, subject to a six-thousand-dollar mortgage. It was

therefore his separate property. *In re Binge's Estate*, 5 Wn. (2d) 446, 105 P. (2d) 689.

The other quarter-section was acquired by appellant three years after his marriage, by inheritance from his father, and also subject to a six-thousand-dollar mortgage. Hence, this was also appellant's separate property. Rem. Rev. Stat., § 6890.

Forty-five hundred dollars of the mortgage principal, together with mortgage interest, taxes, and other maintenance expenses, were paid out of community earnings. This would not, however, change the status of the property from separate to community, though it would impress the property with a community lien. *In re Pugh's Estate*, 18 Wn. (2d) 501, 139 P. (2d) 698.

The trial court was therefore in error if it intended to divide the Edwall property between the parties solely on the theory that it was community property. That this was the motivating factor is indicated in the trial court's oral opinion. After holding the property to be "for all practical purposes" community property, the court said: "On this premise, therefore, it shall stand in the joint names of the plaintiff and defendant . . . ."

Respondent argues that all property of the parties, separate and community alike, is before the court for disposition in this proceeding, and that the division of the Edwall property between the parties is fair and equitable, regardless of its legal status.

It is true that all property of the parties, both separate and community, is before the court for disposition in a divorce proceeding. Rem. Supp. 1949, § 997-11. That statute directs the court to make a "just and equitable" disposition of the property, having regard to (1) the respective merits of the parties; (2) the condition in which they will be left; (3) the party through whom the property was acquired; and (4) the burdens imposed upon it for the benefit of the children.

Here, the trial court made reference only to the third of these considerations, and, as above indicated, proceeded on a wrong premise as to that. The application of

that consideration in fact favors appellant's contention that the Edwall property should have been awarded to him, subject, perhaps, to a community lien. We bear in mind, of course, that this one consideration is not necessarily controlling, though it is only in exceptional circumstances that the court is warranted in awarding to one spouse part or all of the separate property of the other spouse. *Bodine v. Bodine*, 34 Wn. (2d) 33, 207 P. (2d) 1213.

As to the respective merits of the parties, we find nothing to justify the award of half of appellant's separate property to respondent.

■ As to the condition in which the parties will be left, we likewise find nothing to warrant the decreed division of the Edwall farm. Without any share of this property, respondent, now forty-two years old, will be left with property of the value of $21,425, free and clear of all community indebtedness. This does not take into account her share of the community lien on the Edwall farm, referred to below. Respondent will also be entitled to monthly alimony of ninety dollars. On the other hand, appellant, without continued use and ownership of this property beyond the time when Kenneth reaches twenty-one years of age, would have difficulty in liquidating the $23,500 of community indebtedness (exclusive of the mortgages), paying ninety dollars a month alimony, and providing for his own needs. Where the husband is expected to pay off a substantial indebtedness incurred by the community, he ought, if possible, to be left with the means whereby this can be done. The only means in sight for appellant is uninterrupted use and ownership of the Edwall farm.

The final consideration named in the statute—the burdens imposed upon the property for the benefit of the children—has no particular application here, since the decree provides that appellant may retain possession and utilize the profits from the Edwall farm until the youngest child reaches twenty-one.

■ We find that, giving effect to all of the considerations prescribed in Rem. Supp. 1949, § 997-11, there was a

manifest abuse of discretion in awarding respondent a half-interest in the Edwall property.

It is our conclusion that the decree as to the disposition of property and the award of alimony and support money should be modified in the following particulars: (1) The two parcels of land comprising the Edwall farm, as described in the decree, should be awarded to appellant as his sole and separate property, subject to a lien of $2,250 in favor of respondent (this sum representing one half of the $4,500 of community funds paid on mortgage principal, it being considered that interest, tax, and upkeep payments made by the community represent no more than reasonable rental for the use of the land), such sum to be paid to respondent at the time all of the children of the parties, or the survivor of them, shall attain the age of twenty-one years; (2) such life insurance as appellant has or is able to obtain, up to the sum of $7,500, should be kept in force and effect by him, with provision that the three children or the survivors of them be named cobeneficiaries, this requirement to terminate, as to each child, when such child reaches the age of twenty-one years; and (3) in the event that Dolores and Kenneth, or either of them, are not placed under his custody, appellant shall pay eighty dollars a month support money for each of them to the person having such care and custody. The provisions of the decree respecting property and alimony (including the provision making the alimony and support money awards subject to the further order of the court) are, in all other respects, affirmed.

The judgment is reversed and the cause remanded, with directions to proceed in accordance with this opinion.

SCHWELLENBACH, C. J., MALLERY, GRADY, and WEAVER, JJ., concur.