THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LARISSA SOBJACK, | ) | No. 80355-7-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CASEY SOBJACK, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

ANDRUS, A.C.J. — Larissa Sobjack appeals the trial court's determination that real property her husband, Casey,[1] purchased before marriage, but subsequently quitclaimed to the marital community remained Casey's separate property. Because the trial court's legal conclusion that the property at issue is Casey's separate property does not flow from its factual findings and its findings are not supported by substantial evidence, we reverse.

FACTS

Casey and Larissa Sobjack married on September 17, 2011. Larissa has two children from a previous relationship, whom Casey adopted. The couple's son was born the year after they married.

---

[1] We refer to the parties by their first names for clarity only. We mean no disrespect in doing so.

Citations and pin cites are based on the Westlaw online version of the cited material.

Casey and Larissa met in 2009 and, shortly before their marriage, Casey moved into Larissa's home located on Hawthorne Street, in Ferndale, Washington. Larissa and her former partner, Jason, owned the Hawthorne Street home together as joint tenants with rights of survivorship. But when Casey and Larissa met, Jason was no longer in her or her children's lives and Larissa had no knowledge of his whereabouts.

At the beginning of their relationship, Casey worked primarily construction jobs after returning home from an Army deployment in Iraq. He also owned two pieces of real estate. The first parcel contained two rental units at 3603 and 3609 Aldergrove Road in Ferndale, Washington (the Aldergrove property). The Aldergrove property is five acres, with two small residences of 700 to 800 square feet, a field and a barn. Casey purchased the property in 2005 for $185,000 and spent two years renovating the two residences and surrounding property.

After the couple married, they rented out both units for a combined monthly income of $2,200, which they deposited into a marital community joint bank account. Although Casey primarily dealt with the tenants, Larissa contributed to the rental business by managing the leases and other paperwork, such as preparing tenant receipts for deposits and rents.

Casey's second piece of separate property was located on Yew Street in Ferndale, which he purchased in 2008 for $205,000. Casey also renovated this property and, after his marriage to Larissa, rented it out for $1,400 per month, depositing the funds into the couple's joint bank account.

In 2012, Jason's mother, who held a power of attorney for her son, executed a quitclaim deed, transferring his 50 percent interest in the Hawthorne Street property to Casey and Larissa, thus giving Larissa a 75 percent interest and Casey a 25 percent interest in the property. In 2013, Casey and Larissa decided the Hawthorne Street home was too small for their family and they sold it, netting $95,427.69, the proceeds of which they deposited into their joint bank account.

A few months later, the couple purchased a family home at 8452 Valley View Road in Custer, Washington (the Valley View property) for $277,000. Because they qualified for financing through the Veterans' Administration, the couple borrowed the entire purchase price.

In 2013, the couple sold the Yew Street property for $265,000, and deposited net proceeds of $94,255.78 in their joint bank account. In 2014, Casey and Larissa purchased a property located on Poplar Place in Ferndale at a foreclosure auction for $131,500 in cash, using funds from the joint account. Casey remodeled this property and the couple sold it in 2015 for $217,762, netting $194,000 from the sale. They deposited the funds from this sale into their joint account.

In December 2015, Casey used $163,964.86 in community funds from the joint bank account to pay off the mortgage on the Aldergrove property. Casey testified that once he and Larissa married, he did not have an account solely in his name into which he deposited funds. They commingled all of their funds—rental income, wages, Casey's disability income, and proceeds from the sales of various pieces of real estate—into the marital community savings and checking account.

Once the Aldergrove property was free of debt, Casey became concerned about the couple's exposure to liability should a tenant or a visitor injure themselves and bring suit against them:

> So it was my fear that either a tenant, [or] someone out on the property [would] get injured, try to sue and you have a property that is unprotected . . . and a huge asset and then also I had a fear as well is a neighbor kid comes over to the family home, jumps on the trampoline, breaks their neck, tries to sue myself or Larissa or come after that property, so that was my reasoning to protect it in the LLC and protect our names as well.

Casey suggested to Larissa that the couple create a limited liability company to hold title to their rental properties as a way to shield themselves from personal liability. He did his own research and determined this step "was the best thing that I needed to do to protect us." Casey testified he wanted Larissa to be involved in the formation of the LLC and to sign the documents because he felt it was important to protect both of them from potential liability.

Casey hired Bellingham attorney Steve Shropshire to prepare the documents to create the LLC and to transfer ownership of the properties to the LLC. On October 3, 2017, Casey and Larissa executed an agreement creating MMR Properties LLC (MMR)—the name based on the first initials of their three children—with the sole member being "the marital community of Casey Sobjack and Larissa Sobjack, husband and wife." On November 1, 2017, Shropshire prepared two quitclaim deeds by which Casey first transferred his interest in the Aldergrove property to the marital community, then Casey and Larissa both transferred the marital community's interest in the property to MMR.

Casey's quitclaim deed to the marital community provided:

> The Grantor, Casey Sobjack, a married man, for and in consideration of establishing community property pursuant to WAC 458-61A-203(1) and no other consideration, conveys and quit claims to Grantees Casey Sobjack and Larissa Sobjack, husband and wife, all Grantor's interest in the [Aldergrove property].

Casey testified that the purpose of his reference to creating community property pursuant to this regulation was to take advantage of this tax exemption to avoid paying $6,000 in excise taxes.

The quitclaim deed Casey and Larissa signed to transfer the Aldergrove property to the LLC provided:

> The Grantors, Casey Sobjack and Larissa Sobjack, husband and wife, for and in consideration of a mere change in identity pursuant to WAC 458-61A-211(2)(a), and no other consideration, convey and quit claim to Grantee, MMR Properties, LLC . . . all Grantors' interest in the [Aldergrove property].

Casey acknowledged that there was, at the very least, a community interest of $163,965, in the equity of the Aldergrove property.

At the time they formed MMR, the couple opened a checking and savings account in MMR's name and transferred $17,500 in community funds into the new accounts. Although Larissa did not have signatory authority on the MMR accounts, Casey had intended for her to do so; she merely neglected to go to the bank to complete the necessary signature cards. Once these accounts were opened, rent payments were thereafter deposited into MMR's account.

In May 2018, Larissa filed for dissolution of the marriage and the parties separated shortly thereafter. Casey moved into one of the two Aldergove rental units in October 2018 and lived there at the time of trial. But Casey continued to

rent out the second unit. Aldergrove is thus both debt free and income producing property.

Larissa asked the trial court to treat Aldergrove as community property because that was the parties' intent as reflected in the quitclaim deed Casey signed in 2017. Casey, however, testified he had no discussions with Larissa about making Aldergrove community property, he considered it to be his separate property, and he had no intention of converting it to community property.

At the time of trial, Casey's net monthly income was $4,432.09 and Larissa's was $1,258.97. Casey's income figure, however, does not take into account potential rental income from Aldergrove. The parties stipulated at trial that the Aldergrove property is currently valued at $375,000.00 and the Valley View property is valued at $400,000, with an outstanding mortgage of $249,162.

The court found that MMR was a community asset and divided the cash remaining in its bank account equally between the parties. But it concluded that the Aldergrove property, although owned by MMR, remained Casey's separate property, finding that "[t]he substantial testimony was that transfer to MMR was done to provide corporate liability shielding . . ." and thus awarded the property to him. The trial court awarded Larissa the Valley View property and assigned her 100 percent of the mortgage, resulting in a net award to her for this property of $150,838. The court further concluded that Larissa had a right to recover 50 percent of the $163,964 in community funds Casey used to pay off the Aldergove mortgage. After dividing bank accounts and personal property, the court ordered Casey to make an equalization payment of $18,861.75 to Larissa. The court also

ordered Casey to pay Larissa $1,762.75 per month in spousal maintenance from April to September 2019, to cover the Valley View mortgage to give Larissa time to refinance the house, and awarded Larissa $5,000 in attorney fees.

Larissa moved for reconsideration, arguing that Aldergrove, as an asset of the community-owned LLC, could not legally be Casey's separate property, and the court's division of property was inequitable because of the resultant disparity in the award between the parties. The trial court denied this motion and Larissa appealed.

ANALYSIS

Larissa argues that the trial court erred in characterizing Aldergrove as Casey's separate property. We agree because this legal determination does not flow from the trial court's findings of fact and its findings are not supported by substantial evidence.

In performing its obligation to make a just and equitable distribution of properties and liabilities in a marriage dissolution action, the trial court must characterize the property before it as either community or separate. In re Marriage of Groves, 10 Wn. App. 2d 249, 254, 447 P.3d 643 (2019). A trial court's characterization of property is a question of law reviewed de novo. Id. We review factual findings supporting the trial court's characterization for substantial evidence. In re Marriage of Mueller, 140 Wn. App. 498, 504, 167 P.3d 568 (2007). We then determine if the trial court's conclusions of law flow from its findings of fact. Littlefair v. Schulze, 169 Wn. App. 659, 664, 278 P.3d 218 (2012).

The character of property as separate or community is determined at the date of acquisition. In re Estate of Borghi, 167 Wn.2d 480, 483, 219 P.3d 932 (2009). Property obtained by one spouse before marriage is presumed to maintain its separate character in the absence of sufficient evidence to show an intent to transmute the property from separate to community property. Id. at 484. The evidence must show the intent of the spouse owning the separate property to change its character to community property, generally demonstrated through a quitclaim deed, other real property transfer, or community property agreement. Id. (quoting Guye v. Guye, 63 Wash. 340, 115 P. 731 (1911)).

In this case, we have no written findings from the trial court regarding the basis on which it characterized Aldergove. The written findings merely recite that this property is Casey's separate property. As a general rule, we review the final order, not the oral ruling, to determine the adequacy of the court's findings. Ferree v. Doric Co., 62 Wn.2d 561, 566-67, 383 P.2d 900 (1963). The oral ruling generally has "no final or binding effect, unless formally incorporated into the findings, conclusions, and judgment." Id. The findings here incorporated by reference the court's oral rulings, but only as to "the court's specific valuation of property not stated herein." The court did not incorporate by reference his oral findings regarding the characterization of Aldergrove. However, when written findings of fact are incomplete, we can look to the oral decision to understand the court's reasoning. Grieco v. Wilson, 144 Wn. App. 865, 872, 184 P.3d 668 (2008).

The trial court stated, in its oral ruling, that:

[I]t was the intent of the [parties'] transactions leading up to the transfer of the Aldergrove property to MMR . . . to shield the property, the parties, and their marital community and that this intent yields

insufficient evidence to support the burden of proof that the Aldergrove property is now a community asset. The Aldergrove property is Mr. Sobjack's separate property.

We do not take issue with the trial court's finding as to the parties' intent in transferring Aldergrove to the marital community and then to MMR, a marital community LLC. There is substantial evidence in the record to support this factual finding. But the trial court's conclusion that the property is Casey's separate property does not flow from this finding.

First, Casey could have shielded Aldergrove from exposure to judgment creditors by simply transferring that property into an LLC that he held in his own name. There is nothing about his intent to protect the property that negates the quitclaim deed's declaration of purpose—the creation of community property.

Second, Casey testified he wanted to protect not just himself, but Larissa and the marital community, from exposure in the event any neighborhood children injured themselves at the Valley View family home. He was looking for a way to protect the marital community's assets, specifically seeking to protect himself and Larissa from liability. He accomplished this goal by ensuring that Larissa participated in the formation of the LLC, making the marital community the sole member of it, and by having the marital community transfer Aldergrove into the LLC. Again, his testimony and the trial court's finding that Casey intended to protect the marital community does not support the conclusion that he lacked the intent to transmute Aldergrove from separate to community property.

Casey relies on the Supreme Court's decision in Borghi to argue that the language of the quitclaim deed from Casey to the marital community is insufficient evidence of his intent to change the character of Aldergrove. But he overstates

the holding of Borghi. In that case, the decedent, Jeannette, bought real property under a real estate contract before her marriage to Robert. After the couple were married, the seller of the property, Cedarview Development, executed a special warranty deed to Robert and Jeanette, as husband and wife. Id. at 481-82. After Jeannette died, Robert brought a declaratory judgment action to resolve a dispute with Jeannette's son from a prior relationship over the characterization of the property. Id. at 483. The Supreme Court held that Cedarview's inclusion of Robert's name on the special warranty deed did not indicate whether Jeannette intended to transmute her separate property into community property. Id. at 491. Because the focus is on the intent of the spouse who originally owned the separate property, the deed was insufficient by itself to rebut the presumption of separate property.

Borghi is distinguishable. In this case, Casey—not a third party—executed a quitclaim deed transferring Aldergrove to the marital community and expressed his intention in the deed itself: to create community property. Consistent with Borghi, Washington courts routinely hold that a quitclaim deed or valid community property agreement executed by the owning spouse can be sufficient evidence to demonstrate that spouse's intent to transmute separate property to community property. See Volz v. Zang, 113 Wash. 378, 383, 194 P. 409 (1920) ("separate property may be changed by a proper conveyance or agreement into community property"); Groves, 10 Wn. App. 2d at 260-261 (upholding community property agreement requiring equal division of all separate property); In re Estate of Verbeek, 2 Wn. App. 144, 158, 467 P.2d 178 (1970) (mutual written promises to

convert separate into community property are sufficient evidence of intent to transmute).

Casey argues that his quitclaim deed to the marital community does not demonstrate an intent to transmute Aldergrove to community property because the deed "expressly limits its effect to relieving the parties of having to pay excise tax." The trial court appears to have agreed, viewing MMR essentially as "a shell," created for the sole purpose of shielding the marital community from liability and taxes. But again the trial court's legal conclusion does not flow from a finding that Casey entered into the quitclaim deed to avoid paying excise taxes. The tax regulations on which Casey and the trial court relied simply do not support this theory. First, Casey's quitclaim deed referred to "establishing community property pursuant to WAC 458-61A-203(1)."[2] WAC 458-61A-203(1) exempts from excise tax real estate transfers "that establish or separate community property." The only way in which Casey could legally avoid paying excise tax on this transfer was if he intended to create community property.

Second, the quitclaim deed Casey and Larissa signed to transfer Aldergrove from the marital community to MMR refers to WAC 458-61A-211, which exempts from excise tax the transfer of property from an owner to a limited liability company.[3] Under this tax regulation, Casey could have transferred Aldergrove,

_____

[2] WAC 458-61A-203(1) exempts from excise taxes transfers of real estate made for the purpose of creating community property:

> (1) Community property. Transfers from one spouse or domestic partner to the other that establish or separate community property are not subject to the real estate tax.

[3] WAC 458-61A-211, entitled "Mere change in identity or form—Family corporations and partnerships," provides:

> (1) Introduction. A transfer of real property is exempt from the real estate excise tax if it consists of a mere change in identity or form of ownership of an entity. This exemption is

- 11 -

as his separate property, into an LLC of which he was the sole owner, as his separate property, and avoided the payment of excise taxes. There appears to be no legal reason for Casey to transfer the property to the marital community first and then transfer it again to the LLC, if the sole purpose was to avoid the payment of excise taxes.

Moreover, as a matter of law, Casey cannot retain an ownership interest in Aldergrove once he and Larissa transferred that property to MMR, a community-owned LLC. Under RCW 25.15.246(1), members have no ownership interest in any specific property owned by the limited liability company. Although the trial court suggested orally that he considered MMR to be a "shell," there is nothing in this record to support any such factual determination. Washington law treats a member of an LLC as a separate person from the LLC entity itself. Bravern Residential, II, LLC v. Dep't of Revenue, 183 Wn. App. 769, 779, 334 P.3d 1182 (2014); RCW 25.15.071(3) (LLC is separate legal entity). Under RCW 25.15.061, entitled, "Piercing the veil," members will have liability for acts, debts or liabilities of LLC only to the extent that a shareholder of a corporation would be liable in analogous circumstances. The doctrine of veil piercing to allow courts to disregard a corporate entity only applies when the member of the LLC or shareholder of the corporation uses the business entity to intentionally violate or evade a duty owed

not limited to transfers involving corporations and partnerships, and includes transfers of trusts, estates, associations, limited liability companies and other entities. . . .
(2) Qualified transactions. A mere change in form or identity where no change in beneficial ownership has occurred includes, but is not limited to:
a) The transfer by an individual or tenants in common of an interest in real property to a corporation, a partnership, or other entity if the entity receiving the ownership interest receives it in the same pro rata shares as the individual or tenants in common held prior to the transfer.

to another and the member or shareholder's conduct resulted in an unjustified loss to a creditor. Morgan v. Burks, 93 Wn.2d 580, 585, 611 P.2d 751 (1980). There is no evidence to substantiate the finding that Casey was misusing the LLC for such a purpose.

We also question whether there is substantial evidence in this record to support the trial court's finding of fact that Casey did not intend to transmute the property's character. First, the quitclaim deed he executed expressly states Casey's intent was to establish community property for the purposes of avoiding having to pay excise tax. Second, Casey's decision to share ownership of MMR with Larissa demonstrates intent to establish community property. Third, Casey and Larissa engaged in extensive commingling of separate and community funds and Casey made no effort in distinguishing between funds derived from renting units at Aldergrove and community funds. Larissa's 75 percent share of proceeds from the sale of the Hawthorne home, undisputedly her separate property, as well as all of the Aldergrove rental income, were deposited into the couple's joint bank account and used for community expenses and liabilities. Casey paid off the Aldergrove mortgage using community funds from the same account. Finally, Casey conceded the marital community had equity in Aldergrove in the amount of $163,964.86.[4]

---

[4] We recognize that, if a spouse has not intentionally transmuted his separate property into community property, the use of community funds to pay off a mortgage on that separate property does not by itself change the characterization of the property and merely entitles the community to an equitable lien against the spouse's separate property. Merkel v. Merkel, 39 Wn.2d 102, 114, 234 P.2d 857 (1951); In re Marriage of Harshman, 18 Wn. App. 116, 123, 567 P.2d 667 (1977). But we do not have to reach that issue because we reverse the trial court's legal conclusion that Aldergrove remained Casey's separate property after he executed the quitclaim deed to the marital community.

- 13 -

We conclude the trial court's legal conclusion that Aldergrove is Casey's separate property does not flow from its oral findings of fact and substantial evidence does not support the trial court's finding that Casey did not intend to transmute the character of that property.

An error in the characterization of property, however, does not necessarily require us to reverse a trial court's distribution of property. We will do so only where the erroneous characterization controlled the distribution of property in question. In re Marriage of Shannon, 55 Wn. App. 137, 142, 777 P.2d 8 (1989).

> If a trial court mischaracterizes property, we will remand the matter for further consideration when (1) the trial court's reasoning indicates that its division was significantly influenced by its characterization of the property, and (2) it is not clear that had the court properly characterized the property, it would have divided it in the same way.

In re Marriage of Schwarz, 192 Wn. App. 180, 192, 368 P.3d 173 (2016) (quotations omitted).

Based on the trial court's oral ruling, we conclude a remand is necessary here. The trial court's reasoning indicates that its division was significantly influenced by its characterization of the property, and it is not clear that, had the court properly characterized the property, it would have divided it in the same way. The trial court awarded Aldergrove to Casey and rather than awarding Larissa 50 percent of the interest in that property, which had a value of $187,500, the court awarded her 50 percent of the community funds used by Casey to pay off the Aldergove mortgage, in the amount of $81,982.50. The trial court also indicated orally its presumption that community property should be divided equally. Had the trial court properly characterized Aldergrove as community property, it is

- 14 -

reasonable to assume it would have awarded her 50 percent of that asset, or $187,500, or at least some amount greater than the $81,982.50 it awarded to her. We therefore conclude that remand is necessary.

Because we conclude a remand is necessary for the trial court to consider a division of property and liabilities in light of the proper characterization of Aldergrove, we need not address Larissa's separate contention that the trial court's overall division of assets and liabilities was inequitable and unjust.[5]

Larissa requests an award of attorney fees on appeal. The appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs. RCW 26.09.140. "In awarding attorney fees on appeal, the court should examine the arguable merit of the issues on appeal and the financial resources of the respective parties." In re Marriage of Booth, 114 Wn.2d 772, 780, 791 P.2d 519 (1990). RAP 18.1(c) provides that "[i]n any action where applicable law mandates consideration of the financial resources of one or more parties regarding an award of attorney fees and expenses, each party must serve upon the other and file a financial

---

[5] Although we do not reach the issue of fairness of the division of property here, we recognize that Larissa has raised significant and well-founded challenges to the trial court's allocation of community debt. Under the parenting plan to which Casey agreed, the children reside the majority of the time with Larissa. Despite being the primary caregiver of the couple's three children with a monthly income of less than a third of Casey's, the trial court allocated the full $249,162 mortgage on Valley View to Larissa, while it awarded Casey Aldergrove which is unencumbered by debt. Moreover, Casey's ability to generate income by renting out one or both units on Aldergrove was not included in Casey's income determination. The trial court provided no indication as to how Larissa could manage to pay the mortgage or qualify for refinancing or that it considered the likelihood that its property and liability allocation gave Larissa no other option but to sell the family home where she and the children reside. On remand the trial court should reevaluate its division of assets and debts with these considerations in mind. See RCW 26.09.080(4)(court must consider economic circumstances of each spouse at time of division of property, including desirability of awarding family home to spouse with whom children reside the majority of time).

affidavit no later than 10 days prior to the date the case is set for oral argument or consideration on the merits."

Larissa filed her financial affidavit seven days prior to the date the case was set for consideration. Because Larissa failed to comply with the ten-day deadline, we deny her request for an award of attorney fees. See Matter of Marriage of Leland, 69 Wn. App. 57, 76, 117 P.3d 370 (1993) (appellant not entitled to award of attorney fees where she failed to file affidavit of financial need no later than ten days prior to oral argument).

Reversed and remanded for further proceedings consistent with this opinion.

_Andrus, A.C.J._

WE CONCUR:

_Mann, C.J._        _Leach, J._