IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of, | ) | |
| | ) | No. 35133-5-III |
| LORI VAN DE GRAAF, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ROD D. VAN DE GRAAF, | ) | |
| | ) | |
| Appellant. | ) | |

KORSMO, J. —
"Millions for defense, not a cent for tribute."

This motto, adopted by Americans in the wake of the XYZ Affair,[1] apparently also

was adopted by appellant Rod Van de Graaf in the wake of Lori Van de Graaf's filing for

dissolution of the couple's 26-year marriage. The difference in historical outcome—

American resolve to live by its principles led to a treaty with the revolutionary French

government, while Mr. Van de Graaf's resolve to fight turned this matter into an

extended campaign of scorched earth practices—reflects the differences between resolve

practiced by a defender and resolve shown by an aggressor. We largely affirm the trial

---

[1] EMMA WILLARD, HISTORY OF THE UNITED STATES, OR REPUBLIC OF AMERICA, 288-289 (New York, A.S. Barnes & Co.; Cincinnati, H.W. Derby & Co. 1849).

court's dissolution decree and award respondent Lori Van de Graaf her attorney fees in this appeal.[2]

To date, the decree has spawned seven appeals, which we have grouped into four. This case, Van de Graaf I, is the substantive appeal from the decree of dissolution. Van de Graaf II involves appeals from trial court orders awarding suit money to Lori. Van de Graaf III is an appeal from an order changing title to real property awarded to Lori. Van de Graaf IV primarily involves appeals from contempt rulings related to the enforcement of the decree and the suit money awards. These cases also include an extensive number of motions before our commissioner, few of which are relevant to this opinion. Originally, the contempt cases were consolidated with this appeal from the dissolution decree, but our commissioner later severed the contempt cases and grouped them together. One result of the reconfiguration is that briefing was completed on some of those rulings when they were consolidated with this case and others originally were not briefed at all due to a stay. Since all of the briefing is now in, we will regroup some of the issues in different configurations than our commissioner did.

This appeal presents eleven issues, which we primarily address in the order raised by the parties. First, however, we turn to a discussion of the facts related to the marriage

---

[2] For convenience and clarity, we will refer to the parties by their first names or as appellant or respondent.

and family businesses, before looking at the trial rulings and subsequent procedural history of this case. Then we will consider the issues presented by this appeal.

FACTUAL BACKGROUND

Rod and Lori wed in 1985. He was 27 and she was 24. The couple have four sons who were born between 1986 and 1996. Lori has a bachelor's degree and a teaching certificate. She taught full-time for one year prior to the birth of her eldest son. Since that point she has raised the four children and, later, returned to the classroom as a part-time substitute teacher.

Rod worked as a salaried employee for his family's cattle business, Van De Graaf Ranches (VDGR). The business was founded by his parents, Dick and Maxine Van de Graaf. All three of their children—Rod, Karen, and Rick—worked for VDGR. VDGR is a major cattle operation and owns stockyards and feedlots. Van de Graaf Ranch Properties, a related business, leases land for cattle grazing. In addition, the three children formed various partnerships related to the cattle business that engaged in joint ventures with VDGR. The most significant of those partnerships for purposes of this case was Midvale Cattle Company.

Midvale was created by the three siblings in 1991 as a general partnership, with each of them holding a one-third interest.[3] Midvale operated a cattle raising business and

---

[3] In 2003, the three siblings converted Midvale from a partnership to a limited liability company.

leased feedlots and grazing land from their parents' companies. Each of the three siblings borrowed $2 million from VDGR to capitalize Midvale. Lori and Rod jointly executed a $2 million promissory note to VDGR. The note was secured by the couple's interest in Midvale and other personal assets.

The original $2 million promissory note called for semi-annual interest payments and three equal principal payments due in 1995, 2000, and 2005. The note was amended in 1993 to adjust the interest rate, and again in 1995 to extend the principal payment due dates to 2000, 2005, and 2010. Rod and Lori missed the scheduled principal payments, but they did regularly pay interest on the note. Other than $350,000 Rick paid directly to Dick in 1991 when Dick threatened to "recall" Rick's note following a family dispute, none of the siblings ever paid any principal on their individual notes.

Midvale took over many of VDGR's operations after Dick retired. VDGR gives Midvale favorable terms in the joint business ventures, paying Midvale to manage VDGR land and allowing Midvale to use the land for its cattle business as well as lease the land to others. VDGR pays management fees to Midvale and allows Midvale to keep rents collected for leasing out the VDGR lands. Midvale's owners received "guaranteed payments" on a bi-weekly basis that netted each $3,846. Midvale also paid health insurance for the entire family and made additional distributions "as needed." The company also paid all of the family's vehicle expenses and wrote off, as business expenses, Rod's hunting trips.

4

Rod and Rick jointly purchased 342 acres of pasture land near Ellensburg from their parents in 1977. They purchased the land for $120,000. The brothers paid $100 down and agreed to pay the balance, with interest, at $4,800 annually. When Rod and Lori married in 1985, he still owed nearly $51,000 of his $60,000 share of the purchase price. The balance was paid off in 2004. The brothers leased the land to VDGR for cattle grazing and used the income from the lease to pay property taxes and water usage.

Prior to Rod's marriage, his parents had created a "cattle account" for him. That account allowed him to buy and sell cattle for his own personal profit separate from VDGR. After his marriage to Lori, he continued his salaried employment with VDGR and also continued to operate the cattle account. By 1989, the cattle account had accumulated profits of nearly $1.4 million.

The couple used the cattle account profits to build a luxurious home. The family home was described at trial as "massive, well appointed, draped with trophy mounts from [Rod]'s many hunting trips, and featured an indoor pool and Persian carpets." The couple separated in 2011 when Rod moved out that July. He then lived rent free in another house owned by VDGR with his girlfriend and her family.

In 2012, the senior Van de Graafs created an estate plan to transfer 30 percent interests in VDGR to Rick and Karen, but not to Rod. Through a combination of loans and gifts, the parents transferred 90 percent of the VDGR stock in equal shares to Rick, Karen, and a newly created "Maxine Van de Graaf 2012 Family Trust." Dick was the

grantor of the 2012 trust, while Maxine was the beneficiary and trustee. Rod was a "permissible beneficiary" and the first alternate trustee.

For estate tax purposes, VDGR was given a discounted value of $5.71 million, with the 90 percent transferred to Rick, Karen, and the 2012 trust valued at $5.1 million. Rick, Karen, and the 2012 trust each borrowed $833,333 from VDGR to acquire their 30 percent interests. For that sum, which was considered the "sold interest"[4] in VDGR, the purchasers acquired 1,500 shares of nonvoting common stock in the company. The purchase was financed by royalties received from the sale of manure that Midvale processes and sells. For the 20 years prior to the estate plan, the manure had been sold by Midvale without payment of royalties to VDGR and had earned the partnership up to $1,000,000 annually.

Rod and Lori had set up "529 education accounts" for their four sons. The couple's youngest son, N.V.D.G., was 20 and had completed his sophomore year at Washington State University at the time of trial. Rod had also created a uniform gift to minor account (UGTMA) for the boy. At trial, the boy and his mother testified that the UGTMA was not intended to pay for college and that the 529 education account had been exhausted. He was using the 529 account of an older brother who had not completed

---

[4] The remaining value of approximately $866,666 was considered the "gifted interest."

college. Rod testified that N.V.D.G. had $123,000 available to him between the two accounts.

## PROCEDURAL HISTORY

Lori filed for dissolution of the marriage on October 7, 2011. The following July, the trial court entered temporary payment orders requiring Rod to pay Lori $3,000 per month in maintenance plus an additional $1,500 per month to cover utilities and other expenses. Lori remained in the house pending trial.

After extensive pretrial proceedings, a five-day dissolution trial began on September 27, 2016. There was conflicting evidence entered on a number of financial issues. The court entered findings of fact and/or conclusions of law on the following topics germane to this appeal.

Rejecting Rod's argument that Lori had no need for maintenance and/or could return to full time teaching, the court directed that Rod pay Lori spousal maintenance of $6,000 per month until one or the other died. The court also directed that N.V.D.G. and each parent pay one-third of any college expenses not covered by the child's 529 account.

The court valued the couple's share of Midvale at $2 million dollars, choosing a valuation midway between Lori's expert's opinion of $2.2 million and Rod's expert's valuation of $1.7 million.[5] The court concluded that the $2 million promissory note the

---

[5] The experts agreed that their differences resulted from the high cattle prices obtained by Midvale in 2014 and the lower prices realized in 2015.

couple had signed was illusory and did not devalue their share of the company.[6] The

court valued the residence at $1.4 million in accordance with the valuation of Lori's real

estate agent; Rod had valued the home at $772,000. The court determined that the cattle

account funds had been comingled with community funds and characterized both the

house and the cattle account as community property. Turning to the Ellensburg property,

the court ruled that it constituted community property since the bulk of the payments

came from community assets.

Determination and treatment of any interest Rod might have in VDGR presented a

complicated issue in light of the creation of the Maxine Trust that was being funded, in

part, by Rod's Midvale assets, and was clearly designed to be transferred to him. The

court stated:

> And there is ample evidence that such a transfer is going to take place at
> some time after the marriage is dissolved. But there is no evidence that she
> has made such a transfer, so [Rod's] interest in the company remains
> inchoate. So, I do not believe that Respondent's incipient ownership in the
> company is an asset subject to division by this court. However, I believe
> the court can consider the likely acquisition of this interest in determining
> what is just and equitable in the division of other assets and application of
> the factors enumerated in RCW 26.09.090.

Clerk's Papers (CP) at 785.

---

[6] Subsequent to that ruling, the senior Van de Graafs sued Rod and Lori in an
attempt to collect on the note. The trial court dismissed the complaint on Lori's motion
for summary judgment, ruling that the claim was barred by the statute of limitations. *See*
Yakima County Superior Court file No. 16-2-03511-39.

The trial court evenly divided the property, although it ordered Rod to make a transfer payment of $1,171,200 to Lori in order to equalize the two estates. Of the previously noted assets, the court gave Midvale and the family home to Rod, while assigning the Ellensburg property to Lori. The court also gave Rod life insurance policies with a cash value of $116,000. Rod had testified that the policies belonged to the marital community. The court also denied both parties' requests for attorney fees, ruling that although significant resources had been expended in litigation, "both parties have sufficient wherewithal to pay their own costs and fees." CP at 788.

Rod filed the notice of appeal that initiated this case on March 17, 2017.

Lori sought reconsideration of the attorney fee ruling, arguing under *Friedlander*[7] that she was entitled to fees for the extraordinary litigation costs engendered by the complicated business concerns and the family's resistance to sharing information about them. The court agreed and awarded Lori her attorney fees for the outstanding balance owed her attorney of $58,675, approximately one-half of the attorney fees she had incurred to that point.

Lori also brought a motion for contempt due to Rod's failure to pay the monthly maintenance ordered by the court. He, in turn, sought to modify that ruling on the basis that his monthly income was substantially diminished by falling cattle prices, he had not

---

[7] *Friedlander v. Friedlander*, 58 Wn.2d 288, 362 P.2d 352 (1961).

9

received any interest in VDGR, and he could not cash in the insurance policies because they were actually owned by a trust and not by the couple. He subsequently filed a CR 60 motion to vacate the property distribution order using the same argument about the insurance policies.

The trial judge held a hearing April 14, 2017, and found Rod in contempt for willful failure to pay spousal maintenance since November 1, 2016. The court awarded Lori a judgment for the past due support while denying Rod's motion to modify or reduce the support obligation. The court also entered judgment for the attorney fees awarded on reconsideration.

A new contempt motion was filed the following month when Rod failed to comply with the April contempt order. Rod filed a cross-motion for contempt seeking to force Lori to vacate the premises and pay the debts assigned her by the decree. A court commissioner found Rod in contempt for willful failure to pay.

Rod moved to revise the ruling, but the trial judge denied the motion. While revision was pending, Lori filed a motion asking for $65,000 in suit money to defend against Rod's appeal. The commissioner awarded her $30,000. Rod was also found in contempt for willful failure to pay child support in July and August 2017.

Rod filed notices of appeal from several of the post-trial rulings, as well as an amended notice of appeal for this case. Meanwhile, he sought multiple extensions of his briefing obligation in this court, leading our commissioner to require the brief by October

10

31, 2017, and warning that no more extensions would be granted. When that deadline passed without a brief, Lori moved to dismiss the appeal, citing the failure to comply with this court's order as well as the failure to pay the suit money and continued misuse of the appellate rules for purposes of delay. The brief of appellant was filed January 2, 2018.

Lori also successfully sought a new contempt order from the superior court over Rod's failure to pay the suit money. In response to that ruling, Rod paid $10,000 of the $30,000 ordered. The commissioner found Rod in willful violation of the suit money rulings and suspended a five-day jail sentence while indicating that a bench warrant would issue if the remaining money was not timely paid. That ruling led Rod to file a series of unsuccessful emergency motions with this court and the Washington Supreme Court seeking stays of the contempt rulings.

Rod filed a supersedeas bond in the amount of $361,240 on February 21, 2018, to stay enforcement of the equalization payment and the judgment for attorney fees in the trial court. Discovery subsequently showed that Rod's sister and parents had paid nearly $230,000 in fees and costs for his appellate attorneys as of June 2018. Meanwhile, the superior court commissioner awarded Lori additional suit money. The appeal of that award is the subject of Van de Graaf II.

In August 2018, Lori renewed the motion to dismiss the appeal due to failure to pay the suit money. She alternatively sought to condition Rod's continued participation

in the appeal on his payment of the suit money. Our commissioner denied the alternative relief, but passed the motion to dismiss on to the panel that heard the case.

During our March 2019 term, a panel heard oral argument of this case and also considered, without argument, Van de Graaf II. We directed the trial court to enter findings concerning its attorney fee award in this case. The trial court timely complied with that direction and returned findings to this court. We also lifted the stay of the cases that constitute Van de Graaf IV. Those cases ultimately were heard by this panel without argument on our August 2019 docket. Meanwhile, the same panel considered the Van de Graaf III appeal without argument on June 10, 2019. The other three appeals will be addressed in separate opinions.

ANALYSIS

The initial issue for our consideration is Lori's motion to dismiss the appeal. We then turn to the issues presented by Rod.

*Motion to Dismiss*

The motion to dismiss is predicated on Rod's failure to prosecute the appeal in a timely fashion and for using the appeal for the improper purposes of delay and imposing costs on her. Although this claim largely was founded on Rod's intransigent behavior in the postdecree time period, matters that primarily are issue in Van de Graaf IV, it is raised in this appeal, in part due to the previous consolidation of the cases. We address the issue in this appeal because of the significance of the motion to the entire litigation.

12

RAP 18.9(c) permits this court to dismiss an appeal for, among other reasons, want of prosecution or if it was brought solely for purposes of delay. Sanctions may be appropriate where one party is intransigent or uses the rules for delay. *See, e.g.*, *Mattson v. Mattson*, 95 Wn. App. 592, 976 P.2d 157 (1999) (husband's intransigence in making incremental disclosures of his income only when prodded by wife's counsel, and his less than candid portrayal of his termination of optometry clinic lease that led to his voluntary underemployment, justified award of attorney fees to wife on appeal in postdissolution child support modification proceeding).

Although we agree with the trial court that Rod has demonstrated intransigence throughout this entire case, we do not agree that dismissal is required. This court has not found, nor has Lori cited, any previous case in which an appeal was dismissed due to intransigence or purposeful delay. Instead, it appears the usual remedy for intransigence on appeal is to order the intransigent party to pay the other party's attorney fees. *Id*. at 606; *Chapman v. Perera*, 41 Wn. App. 444, 455-456, 704 P.2d 1224 (1985). We will address the appropriateness of a fee award in each case, including at the end of this opinion.

The merits of all of the issues having been briefed and submitted for this court's consideration, dismissal at this stage would serve little purpose where another, adequate, remedy exists. Accordingly, we deny the motion to dismiss these appeals.

13

*General Considerations Governing Rod's Appeal*

Before turning to Rod's appeal, a brief discussion of some of the issues is in order due to the overlapping appeals addressing some of the same issues. This case has grown like Topsy and the parties briefed issues in accordance with the original grouping of the appeals. The subsequent deconsolidation means that some issues are briefed in multiple appeals and that others are briefed under cause numbers that no longer include the relevant notice of appeal. Rather than regroup files yet again and introduce more uncertainty in our records, this opinion will note all of the issues raised in this appeal, but we will address those issues in the appeal logic and judicial economy best suggests we resolve them.

With that observation, it is time to recall a few basic principles of our domestic relations laws. Washington is a community property state. Chapter 26.16 RCW. Thus, property "acquired after marriage" "is community property." RCW 26.16.030. The "word 'acquired' should be construed to encompass wages and other property acquired through the toil, talent, or other productive faculty of either spouse." *In re Marriage of Brown*, 100 Wn.2d 729, 737, 675 P.2d 1207 (1984). Each spouse has equal authority to manage community property, but neither can encumber real estate without the consent of the other, and the ability to give away property by gift or bequest is limited. RCW 26.16.030.

Similarly, property acquired before marriage or by gift or inheritance after marriage is the separate property of the recipient spouse. RCW 26.16.010. Thus, the timing of the property's acquisition is key to characterizing the nature of the property. *In re Binge's Estate*, 5 Wn.2d 446, 484, 105 P.2d 689 (1940).

Trial judges have broad discretion in devising fair resolution of marriage dissolution actions. As a result, an oft-cited passage from the Washington Supreme Court concerning the importance of finality in domestic relations rulings guides appellate review:

> We once again repeat the rule that trial court decisions in a dissolution action will seldom be changed upon appeal. Such decisions are difficult at best. Appellate courts should not encourage appeals by tinkering with them. The emotional and financial interests affected by such decisions are best served by finality. The spouse who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court.

*In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985). This emphasis on finality and moving forward is reflected in the well-settled standards that govern review of domestic relations cases. Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). A court acts on untenable grounds when its factual findings are not supported by the record; it acts for untenable reasons if it uses an incorrect standard of law or the facts do not meet the requirements of the standard of law. *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995).

We now consider the arguments presented by Rod's appeal.

*Consideration of VDGR Property*

Rod first argues that both the property division and the spousal maintenance award were flawed by the trial court's consideration of his future inheritance from his parent's estate as represented by the Maxine Trust. He has not demonstrated that the trial court erred.

Prior to making a property division, the dissolution court must determine the nature and extent of the parties' community and separate property. RCW 26.09.080; *In re Marriage of DeHollander*, 53 Wn. App. 695, 700, 770 P.2d 638 (1989). Vested future benefits are subject to division, but unvested expectations such as an inheritance are not. *See, e.g.*, *In re Marriage of Wright*, 147 Wn.2d 184, 189, 52 P.3d 512 (2002) (vested benefits); *In re Marriage of Hurd*, 69 Wn. App. 38, 49, 848 P.2d 185 (1993) (not vested), *overruled on other grounds by In re Estate of Borghi*, 167 Wn.2d 480, 486, 219 P.3d 932 (2009).

Future earning potential is not an asset that can be divided, but it may be considered when distributing the property and awarding maintenance. *In re Marriage of Leland*, 69 Wn. App. 57, 847 P.2d 518 (1993); *In re Marriage of Anglin*, 52 Wn. App. 317, 759 P.2d 1224 (1988); *see also Stacy v. Stacy*, 68 Wn.2d 573, 576, 414 P.2d 791 (1966) (when awarding alimony following a long-term marriage, the court should consider and weigh the future earning capabilities of both parties). The court may also consider the spouses' "foreseeable future acquisitions" when dividing property and

16

awarding maintenance.  *In re Marriage of Gillespie*, 89 Wn. App. 390, 399, 948 P.2d

1338 (1997); *In re Marriage of Olivares*, 69 Wn. App. 324, 329, 848 P.2d 1281 (1993),

*overruled on other grounds by In re Estate of Borghi*, 167 Wn.2d 480.

Rod argues that the trial court erred in considering his pending inheritance.  The

trial court, however, expressly stated that the VDGR properties were not before the court

for division[8] and the ensuing decree does not mention it.[9]  CP at 770-773, 785.  The court

did "consider" the "likely acquisition" of this inchoate interest of Rod's in assessing what

was a "fair and equitable" maintenance award (citing to RCW 26.09.090).  CP at 785, 787.

This consideration was proper.  *Gillespie*, 89 Wn. App. 390; *Olivares*, 69 Wn. App. 324.

The trial judge was not required to ignore the realities of the parties' actual

financial situation merely because the pending property interest was not vested and, thus,

not before the court for division.[10]  The pending transfer of one-third of his parents'

---

[8] Given the unprecedented diversion of the Midvale manure asset to partially fund the VDGR stock purchases, and ensuing reduction of Rod's earning capacity from that community asset, the trial court may well have been justified in treating the trust as an asset of the marital estate because Rod appeared to be purchasing a portion of it.  Since the court did not do so, we need not speculate further on this point.

[9] The $1.7 million valuation would certainly have skewed the distribution if it had been included.

[10] Rod also argues that the trial court should have considered Lori's pending inheritance if the court could consider his.  The major problem with this argument is that no evidence was presented considering the size or certainty of any pending inheritance; the issue was only mentioned in counsel's argument to the trial court.

property to Rod would have a direct impact on his future earning capacity, a factor that the court could properly consider in making its award. *Stacy*, 68 Wn.2d 573; *Leland*, 69 Wn. App. 57; *Anglin*, 52 Wn. App. 317. Accordingly, there was no error.

Rod has failed to establish that the trial court erred in its "consideration" of the pending transfer of the VDGR properties to Rod and his siblings.

*Life Insurance Policies*

Rod argues that the trial court erred in awarding him the value of life insurance policies that he now claims actually belonged to a trust and not the couple.[11] The trial court did not abuse its discretion in denying his motion to vacate.[12]

Rod had testified at trial that the life insurance policies were community property purchased by the community and that they held a cash value of $116,000. The trial court awarded the policies to Rod at that value. In the motion to vacate, Rod alleged that the policies belonged to a trust and not to the community. In denying the motion, the trial court noted that there may have been "some misrepresentation or misunderstanding"

---

[11] Although the order on motion to vacate judgment is before this court in the Van de Graaf IV appeal, we exercise our authority to resolve this aspect of that ruling in this case since the issue would materially affect the dissolution decree that is the subject of this appeal.

[12] Rod also filed a motion to reconsider in conjunction with the motion to vacate. However, the decree was entered February 17, 2017, and the motion to reconsider was not filed until March 10, 2017, rendering it untimely. CR 59(b). Thus, we only address the motion to vacate.

about the policies, but that it "inures not to Mr. Van de Graaf's benefit." Report of Proceedings (RP) at 1036.

A court errs when awarding property in a dissolution decree if the parties before the court have no ownership interest in the property. *In re Marriage of McKean*, 110 Wn. App. 191, 194-195, 38 P.3d 1053 (2002). This court reviews a trial court's CR 60(b) motion for abuse of discretion. *DeYoung v. Cenex Ltd.*, 100 Wn. App. 885, 894, 1 P.3d 587 (2000). However, a trial court has a nondiscretionary duty to vacate a void judgment. *Allstate Ins. Co. v. Khani*, 75 Wn. App. 317, 323, 877 P.2d 724 (1994).

Rod never established that this award was void. His own trial testimony established that the life insurance policies were community property, clearly putting them before the trial court. His affidavit in support of the motion to vacate judgment provided little support for his post-trial claim that the life insurance policies were not community property. There was no affidavit from the insurance company establishing ownership of the policies, nor was there any substantive information about the alleged trust that would have allowed the trial court to conclude that it was a third party owner of the policies.

In addition to the failure of proof, none of the CR 60(b) bases Rod asserted for relief help him in this circumstance. His argument that the policies were owned by a trust, if true, would not have been "newly discovered evidence" within the meaning of the CR 60(b)(5) since the facts were discoverable during the many years that the policies had been in existence, including the five years between the separation of the parties and the

19

ensuing trial.  To the extent that he argues that the trial court committed an error of law,

CR 60(b) provides him no relief.  Because errors of law are to be resolved on appeal

instead of by motion to vacate, a trial court abuses its discretion in granting a CR 60(b)

motion due to legal error.  *Shum v. Dep't of Labor & Indus.*, 63 Wn. App. 405, 408, 819

P.2d 399 (1991) (citing authorities).

The trial court did not err in rejecting the unproven motion to vacate.

*Characterization of Ellensburg Property*

Rod next argues, correctly, that the trial court erred in its characterization of the

Ellensburg property.  The error, however, was harmless.

As noted previously, the trial court has an obligation to properly characterize the

property before the court.  RCW 26.09.080.  As also previously noted, the

characterization of the property is determined at the time of acquisition of the property.[13]

*Binge's Estate*, 5 Wn.2d at 484.

Here, Rod acquired his one-half interest in the property prior to his marriage to

Lori.  Thus, the Ellensburg property was appropriately characterized as his separate

property.  The vast bulk of the payments, 85 percent,[14] were made during the marriage

---

[13] This is subject to subsequent decisions of the parties such as the entry of a community property agreement.  RCW 26.16.120; Harry M. Cross, *The Community Property Law in Washington (Revised 1985)*, 61 WASH. L. REV. 13, 101-103 (1986); Harry M. Cross, *The Community Property Law in Washington*, 49 WASH. L. REV. 729, 798-802 (1974).

[14] 51,000/60,000.

from community funds. Thus, while the property was Rod's separate property, the marital community maintained a lien for 85 percent of his purchase price. *See In re Marriage of Elam*, 97 Wn.2d 811, 650 P.2d 213 (1982); *Merkel v. Merkel*, 39 Wn.2d 102, 113-115, 234 P.2d 857 (1951).

In light of the trial court awarding each spouse their own separate property, Rod contends that this characterization error requires either a remand or an award of the land to him. In truth, this error was harmless. All property is before the trial court and the judge has authority to award one spouse's separate property to the other. RCW 26.09.080. The only requirement is that the award be "just and equitable" after consideration of four factors. *Id.*

Anticipating this issue, the trial court expressly stated that "this division of property is fair and equitable *regardless of the characterization of any item as community or separate*." CP at 787 (emphasis added). The trial judge could not be clearer in his intent. The Ellensburg property was to go to Lori, regardless of how the property was characterized. Even with that award of separate property to her, Rod still owed another $1.1 million to equalize the community property division; the only remaining alternative was to award her a greater share of the community property. The trial court probably assumed that Rod would rather own Midvale and make an equalization payment than own the Ellensburg grazing land while Lori took his interest in Midvale.

In view of the trial court's clear statement of intent, the mischaracterization of the land as community property did not harm Rod.

*Maintenance Award*

Rod next contends that the trial court erred in awarding Lori maintenance of $6,000 a month for life.  Having considered the proper factors, the trial court did not abuse its discretion in making the award.

Spousal maintenance is governed by RCW 26.09.090.  Its nonexclusive list of factors to be considered includes:

> (a)  The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently . . . ;
> (b)  The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
> (c)  The standard of living established during the marriage . . . ;
> (d)  The duration of the marriage . . . ;
> (e)  The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
> (f)  The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

The purpose of maintenance is to support a spouse until he or she is able to become self-supporting.  *In re Marriage of Luckey*, 73 Wn. App. 201, 209, 868 P.2d 189 (1994).  There is no right to spousal maintenance in Washington, but the decision to grant or deny maintenance is reviewed for abuse of discretion.  *In re Marriage of Zahm*, 138

Wn.2d 213, 226-227, 978 P.2d 498 (1999); *Friedlander v. Friedlander*, 58 Wn.2d at 297-298. Trial courts must consider the statutory factors of RCW 26.09.090. *In re Marriage of Williams*, 84 Wn. App. 263, 267-268, 927 P.2d 679 (1996). However, findings regarding the statutory factors are not necessary as long as it is clear that the court considered them. *In re Marriage of Mansour*, 126 Wn. App. 1, 16, 106 P.3d 768 (2004). It is the prerogative of the trial court, rather than the appellate court, to weigh the factors. *Zahm*, 138 Wn.2d at 227.

The court's ultimate concern must be the parties' economic situations postdissolution. *Williams*, 84 Wn. App. at 268. The court is not required to place the parties in precisely equal financial positions at the moment of dissolution. *In re Marriage of White*, 105 Wn. App. 545, 549, 20 P.3d 481 (2001). If, as here, the spouses were in a long-term marriage of 25 years or more, the court's objective is to place the parties in roughly equal financial positions for the rest of their lives. *In re Marriage of Rockwell*, 141 Wn. App. 235, 243, 170 P.3d 572 (2007). To reach this objective, the court may account for each spouse's anticipated postdissolution earnings in its property distribution by looking forward. *In re Marriage of Wright*, 179 Wn. App. 257, 262-263, 319 P.3d 45 (2013).

Lifetime maintenance awards are generally disfavored. *In re Marriage of Coyle*, 61 Wn. App. 653, 657, 811 P.2d 244 (1991). Nonetheless, "the only limitation placed upon the trial court's ability to award maintenance is that the amount and duration,

considering all relevant factors, be just." *In re Marriage of Washburn*, 101 Wn.2d 168, 178, 677 P.2d 152 (1984). "Where the assets of the parties are insufficient to permit compensation to be effected entirely through property division, a supplemental award of maintenance is appropriate." *Id.* Maintenance is "a flexible tool to more nearly equalize the postdissolution standard of living of the parties, where the marriage is long term and the superior earning capacity of one spouse is one of the few assets of the community." *In re Marriage of Sheffer*, 60 Wn. App. 51, 57, 802 P.2d 817 (1990).

Against these stringent standards, Rod argues that the maintenance award was untenable, failed to serve the goal of making Lori self-sufficient, and was unnecessary to effectuate the property division. We disagree with this assessment.

The lifetime payment was not untenable. The trial court correctly observed that Rod was a wealthy man who was about to become even more wealthy. He owned a significant amount of separate property and was awarded the community's primary income-producing asset, Midvale. The trial court concluded that Rod's average annual income was in the neighborhood of $200,000 and his expenses were practically nonexistent since the family companies paid for them. In light of those circumstances, he was capable of paying a lifetime maintenance award.

24

In contrast, Lori's situation was not as rosy. Her age and health concerns meant that a return to full-time teaching was unlikely and any career would not be lengthy.[15] She had need of support given her comparatively limited income. She was unlikely to ever approach the standard of living previously enjoyed by the couple. Thus, the trial court properly concluded that maintenance was necessary for Lori's support.

While Rod disagrees, the maintenance award also served to justify the property division. The bulk of the couple's income came from Rod's employment and Midvale. Since Midvale was the primary income-producing asset of the couple, the award of that asset to Rod meant that none of the other assets would give Lori an income stream commensurate with their standard of living. Rather than continue joint ownership of Midvale, maintenance served to provide Lori an income from that asset while eliminating her ownership interest in the asset. It is not unusual when a single source is primarily responsible for a couple's income for a court to make a maintenance award in favor of the party who no longer has access to the asset; there simply is no other income-producing asset that could take its place.

The court's maintenance award was supported by tenable grounds in the record. Rod was awarded the primary income-producing asset and there were no additional assets

---

[15] By the time of trial in 2017, both parties were in their later 50s and had been married nearly 32 years. If the matter had been resolved in 2012, lifetime maintenance might have been unnecessary.

that could have been awarded to Lori. In light of the disparate income resulting from that division and the unlikelihood of Lori ever being able to adequately support herself, the trial court's award was both understandable and reasonable.

The court did not abuse its discretion.

*Post-Secondary Support*

Rod next argues that the trial court erred in issuing an order for post-secondary support of N.V.D.G. that required the parents and child to each pay one-third of any educational expenses not covered by the 529 education account.[16] Once again, we disagree and conclude that the trial court did not abuse its discretion in this matter.

The trial court has broad discretion to order support for postsecondary education. *Childers v. Childers*, 89 Wn.2d 592, 601, 575 P.2d 201 (1978); *In re Marriage of Newell*, 117 Wn. App. 711, 718, 72 P.3d 1130 (2003). This court will not substitute its judgment for the trial court's judgment if the record shows the court considered all relevant factors and the award is not unreasonable under the circumstances. *In re Marriage of Griffin*, 114 Wn.2d 772, 776, 791 P.2d 519 (1990).

The trial court must initially find that the child is dependent and "relying upon the parents for the reasonable necessities of life." RCW 26.19.090(2*)*. Once that threshold

---

[16] A court commissioner had entered the same ruling at a pretrial hearing three years previously. CP at 365.

requirement is satisfied, the trial court must also consider the following nonexhaustive

list of factors:

> Age of the child; the child's needs; the expectations of the parties for their
> children when the parents were together; the child's prospects, desires,
> aptitudes, abilities or disabilities; the nature of the postsecondary education
> sought; and the parents' level of education, standard of living, and current
> and future resources.

RCW 26.19.090(2). "Also to be considered are the amount and type of support that the

child would have been afforded if the parents had stayed together." *Id.*; *In re Marriage of*

*Cota*, 177 Wn. App. 527, 537, 312 P.3d 695 (2013). The statute does not require the trial

court to enter findings. *In re Marriage of Morris*, 176 Wn. App. 893, 906, 309 P.3d 767

(2013).

Rod's argument[17] is that N.V.D.G. had access to the funds in the UGTMA account

adequate to pay for his needs, thus rendering the child not dependent on his parents for

support. In fact, the existence of the parent-funded accounts proves the opposite. The

child did not have an independent source of income, but was dependent on parental

funding mechanisms to attend college. He was not an emancipated child, but remained

dependent on his parents for his living expenses.

---

[17] Rod also argues that (1) the trial court sua sponte raised the post-secondary
support issue and (2) that findings were required. The answer in both cases is no: (1) RP
at 82-83 (pretrial ruling reserving expenses for junior and senior year); (2) *Morris*, 176
Wn. App. at 906.

Regardless, the trial court heard testimony that the UGTMA account was not intended to be used for college education and that the existing 529 education account proved inadequate to cover all of the college expenses, which the parents had intended to pay. Both parents had attended college and evidence concerning their income and resources constituted a significant portion of the trial. N.V.D.G. had completed two years of college before the funding issue arose. The trial court heard evidence on all of the RCW 26.19.090 factors, thus assuring their "consideration" before confirming the educational support award.

Having considered all relevant statutory factors, and many of the suggested factors, the trial court did not abuse its "broad discretion" in awarding post-secondary support.

*Attorney Fees*

Rod next argues that the trial court erred on reconsideration in granting Lori the $58,000 balance of her attorney fees due to the contentious nature of the trial litigation. Having initially sent this question back to the trial court for clarification, we now affirm.

Trial courts have the power in dissolution proceedings to order one side to pay the attorney fees of the other when the receiving spouse has need and the paying spouse has the ability to pay. RCW 26.09.140. In its initial letter ruling, the court declined to grant fees to either side under this statute. Citing *Friedlander*, Lori moved to reconsider under the statute as well as arguing that Rod's intransigence justified an award of fees. The

court granted the motion. The court's letter briefly remarked on both *Friedlander* and intransigence. We remanded to ascertain the significance, if any, of the intransigence comment. The court entered findings of fact clarifying that Rod's intransigence was the basis for ordering the award.[18]

*Friedlander* authorizes an award of attorney fees when complicated business and property holdings require extraordinary work for the opposing attorney to untangle and understand the nature of the property interests. 58 Wn.2d at 297. A court may also base a fee award on a party's intransigence. *MacKenzie v. Barthol*, 142 Wn. App. 235, 242, 173 P.3d 980 (2007); *Eide v. Eide*, 1 Wn. App. 440, 445, 462 P.2d 562 (1969). An award due to intransigence is an equitable remedy. *In re Marriage of Greenlee*, 65 Wn. App. 703, 708, 829 P.2d 1120 (1992). Among the remediable instances of intransigence is "when one party made the trial unduly difficult and increased legal costs by his or her actions." *Id*.

"When intransigence is established, the financial resources of the spouse seeking the award are irrelevant." *In re Marriage of Morrow*, 53 Wn. App. 579, 590, 770 P.2d 197 (1989). Although fee awards due to intransigence should be segregated to address

---

[18] Although the court's clarification came after the briefing in this case, there is no need for additional briefing since the topic, although lightly touched on by Rod in this case, has been briefed more thoroughly in the other cases. We note Rod's objection to the findings in the trial court and will presume he continues those objections in this court, so there is no need for supplemental briefing in order to allow him to assign error.

only the intransigent behavior, there is no need to segregate when the intransigence permeates the proceedings. *In re Marriage of Sievers*, 78 Wn. App. 287, 301, 309, 897 P.2d 388 (1995) (affirming trial court's award of one-half of wife's attorney fees where husband's intransigence "sufficiently permeated the proceedings" to justify such an award). Attorney fee awards based on the intransigence of one party have been granted when the party engaged in "foot-dragging" and was an "obstructionist," as in *Eide*, 1 Wn. App. at 445; when a party filed repeated unnecessary motions, as in *Chapman*, 41 Wn. App. at 455-456; or simply when one party made the trial unduly difficult and increased legal costs by his or her actions, as in *Morrow*, 53 Wn. App. at 591. This court reviews decisions to award fees or not for abuse of discretion. *In re Marriage of Zeigler*, 69 Wn. App. 602, 609, 849 P.2d 695 (1993).

The combination of *Friedlander* and intransigence provides tenable grounds for the trial court's fee award. Unwinding the interconnected family businesses, understanding the various ownership groups, and valuing the community and separate property components took extraordinary effort and required the use of an expert. Those problems were complicated significantly by the family's actions in circling the wagons and limiting information. Rod's additional behavior in making life as financially difficult for Lori as he could during the years leading to the trial reinforced the conclusion that his family was actively working with him against his spouse.

Under these circumstances, the trial court had no difficulty in assigning the remaining one-half of Lori's attorney fees to Rod's intransigence and ordering that he pay those costs. *See Sievers*, 78 Wn. App. at 301 (award of half of attorney fees due to intransigence permeating trial court proceedings). His strategy was to raise the cost of litigation while limiting her financial ability to compete with him. The trial court did not err in determining that this financial abuse needed to be remedied.

Even without considering the trial court's specific factual findings, which are supported by the evidence, the conclusion that intransigence fueled this litigation is amply supported by the record in this case. There were tenable reasons to award Lori her attorney fees. The court did not abuse its discretion in making its award.

*Modification and Contempt Rulings*

The next two issues Rod raises—the court's refusal to modify the maintenance award and some of the ensuing contempt rulings—were originally briefed in this case. We defer our consideration of those contentions to the opinion in Van de Graaf IV in light of the reassignment of related cases to that matter.

*Remand to a New Judge*

Rod also asks that we remand this case for further proceedings before a different judge, arguing that Judge McCarthy acted beyond his authority in some of his rulings, thereby evidencing an inability to give Rod a fair trial. This opinion will not require

further action[19] from Judge McCarthy, technically rendering the question moot in this case, but the argument also impacts the remaining appeals. Accordingly, we consider his argument at this time. Since his argument is unpersuasive, we deny the request.

The appearance of fairness doctrine requires recusal where the facts suggest a judge is actually or potentially biased. *Tatham v. Rogers*, 170 Wn. App. 76, 93, 283 P.3d 583 (2012). Judges not only must actually be unbiased, but they also must appear to be unbiased. *State v. Gamble*, 168 Wn.2d 161, 187, 225 P.3d 973 (2010). The trial court is presumed to perform its functions without bias or prejudice. *Wolfkill Feed & Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 841, 14 P.3d 877 (2000).

Thus, a party alleging bias must provide evidence of actual or potential bias. *State v. Post*, 118 Wn.2d 596, 618-619, 826 P.2d 172, 837 P.2d 599 (1992). Appellate courts apply an objective test, viewing the evidence as would a reasonable person familiar with all of the facts, to determine if there is the appearance of bias. *In re Marriage of Davison*, 112 Wn. App. 251, 257, 48 P.3d 358 (2002). In the absence of evidence, the claim of bias must be rejected. *Post*, 118 Wn.2d at 619.

As evidence of bias, Rod argues that the court's (allegedly) erroneous rulings against him at trial and on reconsideration (and afterwards) establish Judge McCarthy's

---

[19] The sole error we have identified—the mischaracterization of the Ellensburg property—is harmless, and the mischaracterization of that property in the trial court's letter opinion has no future consequences, so no remand for correction of that letter is necessary.

bias. They do not. Not only are the claims of error discussed in this appeal without merit, such claims should nearly always be inadequate to establish a claimant's burden. Objectively viewed, an erroneous ruling is simply that—an error of law by a trial court judge. An error, or series of them, seldom will constitute evidence of bias.

The primary case relied on by Rod is not to the contrary. *In re Marriage of Muhammad*, 153 Wn.2d 795, 108 P.3d 779 (2005). There, the Washington Supreme Court held that the trial court abused its discretion where it improperly considered marital fault when dividing the parties' property. In addition to certain inequitable aspects of the property division, the court found that specific language used by the trial court in both oral rulings and the written findings suggested an improper consideration of the wife's "fault" since there was no proper purpose for discussing the wife's actions. *Id.* at 804-805. Under those circumstances, remand to a new judge was appropriate.

More than mere legal error was at issue in *Muhammad*, but nothing other than alleged legal error is at issue here. Accordingly, *Muhammad* does not compel disqualification of Judge McCarthy from future proceedings in this case. Our review of this extensive record convinces us that Judge McCarthy was scrupulously fair and even-handed throughout this case. He maintained an even keel while recognizing (and rejecting) overzealous and improper behavior, including Rod's breaches of fiduciary duty to Lori and the children and his disregard for multiple court orders. We would hope that

all trial judges confronted with scorched earth tactics and bullying behavior would address them with the same equanimity.

The request for remand to a new judge is rejected. Rod's argument comes nowhere near establishing his claim.

*Attorney Fees on Appeal*

Lastly, we turn to Lori's request for attorney fees on appeal due to Rod's intransigence.[20] This request applies to all of the cases on appeal. We will separately address the issue in each of the four opinions. In this instance, we grant the bulk of her request.

An appellate court may grant attorney fees as a sanction when an appeal is frivolous or brought for improper purposes. RAP 18.9(a). The appellate court also may grant attorney fees as a remedy to one party's intransigence. *Mattson*, 95 Wn. App. at 606; *Eide*, 1 Wn. App. at 445-446.

This appeal was not frivolous. Significant financial interests were at issue and Rod identified one error that could have overturned the property division but for the trial judge's skillful resolution of the issue. Accordingly, we decline to impose sanctions for frivolous litigation.

---

[20] Our discussion of Rod's challenge to the initial suit money awarded is deferred to Van de Graaf II.

That does not mean that Rod is home free. While there may have been justifiable reasons for appealing, the appeal itself was conducted in a manner consistent with the delaying tactics used in the trial court. Accordingly, Lori requests that her attorney fees be paid by Rod's lawyers. We have some sympathy for her position because this case has been over-litigated in the extreme, particularly considering the standards of review, but we decline her request. In the absence of evidence that the attorneys have been directing Rod's conduct throughout this litigation, this appears to be at worst a case of poor client control with appellant continuing to act on appeal as he did before trial.[21]

Without hesitation, we reach the same conclusion that the trial court did. This litigation, however justified at its inception by the financial interests at issue, has been conducted in a manner designed to beat down the respondent rather than reach a proper resolution on the merits. Equity demands that she be afforded some relief.

Domestic relations cases spawn more emotionally-fueled litigation than most other legal practice areas. In this case, appellant has purposely imposed costs on respondent. He has accepted the benefits of the decree, but has often declined to comply with his obligations under that document. His behavior has been calculated to raise Lori's legal costs, just as the trial court found he did in the trial proceedings. The intransigence that

---

[21] The facts are well known to the parties. We purposely have been vague or conclusory in order to avoid detailed reference to the facts lest they serve as a primer to others.

permeated those proceedings likewise permeates this appeal. Thus, even though Rod scored a small victory concerning the characterization of the Ellensburg property, we grant Lori her reasonable attorney fees for the briefing and motions filed under this cause number, subject to her timely compliance with RAP 18.1.

The judgment is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Korsmo, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Siddoway, J.

36